EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* PAUL DOLCE, acusado y apelante.

Número: CR-76-9      Resuelto: 13 de diciembre de 1976

*Jorge Arroyo Fernández,* abogado del apelante; *Miriam Naveira de Rodón, Procuradora General,* y *Rolando Rodríguez Ossorio, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

Exige este caso el examen del alcance de la garantía constitucional contra registros e incautaciones irrazonables cuando, al detenerse al conductor de un vehículo por violación

a las leyes de tránsito, se descubre prueba dentro del automóvil sobre la comisión de otro delito.

Mientras un automóvil oficial de la policía patrullaba de noche las calles del Viejo San Juan, se encontró un vehículo que transitaba por la Calle Comercio en dirección opuesta al tráfico autorizado. El agente lo detuvo y le solicitó al chófer, Henry Dumornay, que le mostrase su licencia de conducir. Dumornay contestó que no tenía licencia. El policía le indicó que en tales circunstancias debía acompañarle a la Sala de Investigaciones. Al descender Dumornay del vehículo se encendió el interior del mismo y el agente vio en el asiento delantero una bolsa de tela, la cual, conforme su declaración, contenía por encima picadura de supuesta marihuana. Observó también que en el piso de la guagua, en la parte delantera, había un paquete cuadrado y que en el asiento trasero, donde viajaba el apelante, Paul Dolce, se hallaba una bolsa de papel grande con paquetes en su interior. El agente le preguntó a Dumornay sobre el contenido de los paquetes y éste se quedó callado, titubeando un poco. El policía tomó entonces un paquete, lo olfateó, sospechó que contenía marihuana y le dijo en consecuencia al apelante que él también estaba detenido. El apelante se dio inmediatamente a la fuga, siendo apresado horas más tarde. Mientras tanto se condujo a Dumornay con el vehículo al cuartel, donde se le entregaron los paquetes al químico. Había setenta y dos paquetes dentro de los observados originalmente por el policía. El químico concluyó que los paquetes contenían marihuana.

Se acusó al apelante por infracciones a la Ley de Sustancias Controladas. Se le halló culpable en juicio por tribunal de derecho y se le condenó a cumplir concurrentemente sentencias de ocho a doce años de reclusión en presidio. El apelante sostiene ante nos que se le condenó a base de prueba obtenida en violación a lo dispuesto en la Enmienda Cuarta de la Constitución de los Estados Unidos y de la Sec. 10 del Art. II de la Constitución de Puerto Rico. El planteamiento

del apelante encierra un problema de índole procesal, otro de método y una cuestión de naturaleza sustantiva.

# I

*El problema procesal.*

La moción de supresión de evidencia se interpuso por el apelante al terminar de desfilar la prueba de cargo. La Regla 234 de las de Procedimiento Criminal ordena que este género de moción "se hará cinco días antes del juicio a menos que no hubiere oportunidad para ello o que el acusado no le constaren los fundamentos de la moción, o que la ilegalidad de la obtención de la evidencia surgiere de la prueba del fiscal." Esta Regla, derivada principalmente de los Arts. 517, 518 y 518A del Código de Enjuiciamiento Criminal de 1935, es distinta a sus equivalentes federales, las Reglas 12 y 41(e) y (f), las cuales se aproximan al procedimiento modernamente recomendado por el Instituto Americano del Derecho. El Instituto no le impone al acusado obligación alguna de radicar la moción de referencia antes del juicio a menos que el Ministerio Público le notifique formalmente que ha de utilizar determinada prueba. En adición, el tribunal tiene amplia discreción para permitir la moción de supresión durante el juicio. American Law Institute, *A Model Code of Pre-Arraignment Procedure,* 15 de abril de 1975, sec. 290.1. Véase: *Henry* v. *Mississippi,* 379 U.S. 443 (1965).

En el caso de autos, por haber surgido de la prueba del fiscal la posible ilegalidad de la obtención, es invocable la tercera excepción establecida en la Regla 234.

En *Pueblo* v. *Nieves,* 67 D.P.R. 305, 307–308 (1947), señalamos que "si mientras se presenta la prueba de cargo surge del examen directo o del de repreguntas que la evidencia fue ilegalmente obtenida—como hemos supuesto en el presente caso—y por lo tanto, no es necesario detener los procedimientos en el caso criminal para resolver una cuestión colateral, el acusado puede objetarla, a pesar de que antes

del juicio hubiera tenido conocimiento de que tal evidencia se intentaba presentar en su contra y aunque previamente al juicio hubiera solicitado tal supresión y la moción para suprimirla hubiese sido denegada." A continuación añadimos, citando a *Gouled* v. *United States,* 255 U.S. 298, 313 (1921): "No debe permitirse que una regla de procedimiento por cualquier razón técnica prevalezca sobre un derecho constitucional." *Loc. cit.* Al mismo efecto que *Nieves,* véanse *Pueblo* v. *Díaz Cintrón,* 91 D.P.R. 146, 149 (1964); *Pueblo* v. *Barrios,* 72 D.P.R. 171, 173-174 (1951); *Pueblo* v. *Villariny,* 71 D.P.R. 741, 745-746 (1950) y *Pueblo* v. *Pierantoni,* 67 D.P.R. 806, 808 (1947). El caso de autos presenta una situación de hechos análoga a la de *Nieves* y en consecuencia se rige por su norma.

## II

*El problema de método.*

La garantía contra los registros y allanamientos irrazonables ha atravesado en el curso de su accidentada historia diversos períodos de contracción y ampliación. Como los ríos, se ensancha y se estrecha, se seca y se desborda y a veces hasta cambia de rumbo. Landynski, *Search and Seizure and the Supreme Court,* Baltimore, The Johns Hopkins Press, 1966. Lo curioso es la fidelidad con que nuestra doctrina usualmente ha calcado en diversas fases las vueltas y revueltas de estas aguas en el derecho federal norteamericano. *Informes de la Comisión de Derechos Civiles del Estado Libre Asociado de Puerto Rico,* vol. I, pág. 413 (1973). Esto no ha sucedido en varias jurisdicciones estatales, lo que nos fuerza a explorar brevemente la relación entre la Enmienda Cuarta y sus equivalentes en otros textos constitucionales que también amparan a los ciudadanos de los Estados Unidos. Ello es indispensable para la selección del método a seguir en el análisis del problema que nos ocupa.

Los principios rectores de esta relación son claros. La

Enmienda Cuarta describe el ámbito mínimo de la garantía que reconoce. Los estados no pueden achicar esas fronteras, pero pueden expandirlas. En *United States* v. *Robinson*, 414 U.S. 218 (1973) y *Gustafson* v. *Florida*, 414 U.S. 260 (1973), por ejemplo, casos a que aludimos más tarde, el Tribunal Supremo de los Estados Unidos redujo considerablemente la protección del ciudadano en el caso de registros de la persona incidentales a un arresto legal. La reacción de varios estados ha sido negativa, rehusando adoptar estos fallos en la interpretación de sus propias constituciones. En *People* v. *Brisendine*, 531 P.2d 1099, 1111–1112 (Cal. 1975), se afirmó:

"Queda por considerar si debemos atenernos a nuestros precedentes sobre este particular, aunque impongan estándares más altos que los que ahora requiere *Robinson*. Nuestro derecho a hacerlo no puede cuestionarse. . . . (E)l Tribunal Supremo de los Estados Unidos ha aceptado claramente que los tribunales estatales son los árbitros finales del derecho estadual, aunque se trate de disposiciones constitucionales textualmente paralelas, a menos que la interpretación estatal pretenda restringir las libertades que la Carta federal le garantiza a la totalidad de la ciudadanía.

Este tribunal ha asumido siempre la vitalidad independiente de la Constitución de nuestro estado. En cuestiones de registros y allanamientos nuestras decisiones se han asemejado a menudo al derecho federal, pero nunca ha existido duda de que esta similaridad ha sido más bien producto del libre arbitrio que de sentido alguno de compulsión." (Traducción nuestra.)

En *State* v. *Kaluna*, 520 P.2d 51, 58 (Hawaii 1974), se rechazó también a *Robinson* y *Gustafson* señalándose:

"Al interpretar la constitución de Estados Unidos debemos, por supuesto, seguir las expresiones aplicables del Tribunal Supremo de Estados Unidos. . . .

No obstante, como el tribunal de última instancia de este estado, esta Corte tiene autoridad final para interpretar y aplicar la Constitución de Hawaii. No hemos vacilado en el pasado en extender la protección de la Carta de Derechos de Hawaii más allá del palio de disposiciones textualmente paralelas de la Carta federal de Derechos cuando la lógica y la de-

bida consideración del propósito de tales garantías así lo han exigido." (Traducción nuestra.)

■ El Tribunal Supremo de Estados Unidos ha reconocido expresamente la facultad de los estados federados para expandir la garantía contra registros y allanamientos ilegales más allá de los límites de la Enmienda Cuarta. *Cooper* v. *California*, 386 U.S. 58, 62 (1967); *United States* v. *Sibron*, 392 U.S. 40, 60–61 (1968).

¿Goza la Constitución de Puerto Rico de vitalidad independiente, al igual que la de los estados federados? La tiene, según doctrina de este Tribunal por considerable tiempo.[1] En cuanto a Puerto Rico concierne este Tribunal ha adoptado criterios constitucionales a la vanguardia de los enunciados en algunos de los dictámenes del Tribunal Supremo de los Estados Unidos. Así reconocimos el derecho a un acusado de delito menos grave a estar representado por abogado mucho antes de *Gideon* v. *Wainwright*, 372 U.S. 335 (1963) y *Rivera Escuté* v. *Delgado*, 80 D.P.R. 830 (1958). A ese efecto expresamos en *Soto Ramos* v. *Supert. Granja Penal*, 90 D.P.R. 731, 734 (1964):

"Este Tribunal ha mantenido una posición de avanzada, no aventajada por nadie, en materia del derecho de los acusados a tener asistencia legal. Aun cuando *Powell* v. *Alabama*, 287 U.S. 45 (1932) se limitó en su expresión a casos de delitos capitales o muy graves, este Tribunal ha reconocido ese derecho en cuanto a todo delito, las faltas leves inclusive. Puede decirse que no fue hasta casi los otros días que el Tribunal Supremo de los Estados Unidos, en *Gideon* v. *Wainwright*, 372 U.S. 335, resuelto en 18 de marzo de 1963, revocó su decisión en *Betts* v. *Brady*, emitida y en vigor desde el año 1942, en que se había establecido que constitucionalmente un Estado no venía obligado a proveerle asistencia legal en el juicio a un acusado en todas las ocasiones y bajo cualquier circunstancia. Este Tribunal ha garantizado el derecho a la asistencia de

---

[1] Compárese: *De Castro* v. *Board of Commissioners*, 322 U.S. 451 (1944).

abogado en todo momento de procedimiento criminal, incluyendo la lectura de la acusación misma, antes de que se resolviera *Hamilton,* y provee esa asistencia en apelación aun antes de que se resolviera *Douglas."*

Veánse: *Reyes* v. *Tribunal Superior,* 84 D.P.R. 29 (1961) y *Rivera Escuté* v. *Jefe Penitenciaría,* 92 D.P.R. 765 (1965).

La historia de la garantía contra los registros irrazonables ofrece un ejemplo vívido de la necesidad de esta posición. La forma de la Sec. 10 del Art. II de la Constitución de Puerto Rico sobre el particular que nos ocupa es análoga a la de la Enmienda Cuarta, pero el contenido es distinto. Ambas disposiciones respondieron a circunstancias diferentes y es natural que su interpretación se atenga, dentro del marco de nuestras relaciones con Estados Unidos, a las realidades cambiantes de una y otra sociedad.

El pueblo de Estados Unidos llevaba largos años de goce de la libertad contra los registros irrazonables cuando comenzó a asomar aquí la promesa de su disfrute. Desconocimos totalmente esa garantía durante los siglos dieciséis, diecisiete y dieciocho y el siglo diecinueve fue trágico teatro de esfuerzos, mayormente fallidos, por disfrutar, al menos hasta el punto en que se le conocía en España, esta libertad.

La Constitución de Cádiz de 1812, la cual rigió en Puerto Rico de 1812 a 1814 y de 1820 a 1823, reconocía la libertad contra registros irrazonables, aunque de modo un tanto cauteloso. [2] En el tercer momento liberal, cuando se adopta la Constitución de 1837, la cual incluyó en su Título Primero, Arts. 7 y 8, una versión aún más pálida de la garantía que la expuesta en la Constitución gaditana, se excluyó paradójicamente a Puerto Rico de sus términos. Igual ocurrió en 1845 al no extenderse tampoco la Constitución de dicho año a los

---

[2] Veáse el Art. 306 de la Constitución de Cádiz. En Tierno Galván, E., *Leyes Políticas Españolas Fundamentales* (1808-1936), ed. Tecnos, Madrid, 1968 y en otras colecciones pueden consultarse los textos constitucionales pertinentes.

territorios de Ultramar. No es hasta 1869 que una Constitución española contiene una verdadera Carta de Derechos, pero no se logró su extensión, con ciertas limitaciones, a Puerto Rico hasta el advenimiento de la República en 1873. Con la restauración de la monarquía al año siguiente todo se vino abajo, sin embargo, y entre las metas principales del Partido Liberal Reformista hubo que incluir nuevamente la aplicación a Puerto Rico del Título Primero de la Constitución de 1869. Luego advino, en 1876, la última Constitución española del siglo diecinueve. Era de signo abiertamente conservador. La Carta de Derechos de esta Constitución fue tan solo pía declaración de principios, inoperantes en ausencia de leyes específicas que los validaran. Aún así, no se extendió la Constitución de 1876 a Puerto Rico hasta el 2 de abril de 1881 y no se hicieron aplicables a Puerto Rico las leyes dictadas para hacer efectivas sus disposiciones. Esto explica la aparente anomalía de que el Partido Autonomista reclamase la aplicación al país de la Carta de Derechos. La extensión a Puerto Rico de dicha parte de la Constitución de 1876 había sido puro teatro y lo siguió siendo hasta 1897. No fue hasta el propio día en que se promulgó la Carta Autonómica en que, por decreto separado, se extendieron a Puerto Rico y Cuba, aunque no en su totalidad, las leyes necesarias para darle vida al Título I de la Constitución de 1876.

Al aprobarse la Ley Foraker en 1900, permanecieron deficiencias del período de gobernación militar. En adición, la Carta Orgánica que oportunamente se aprobó para las Islas Filipinas, 32 Stat. 54, 57° Cong. 1ª Ses., Cap. 140, contenía una Carta de Derechos. La de Puerto Rico no. El 27 de febrero de 1902 se aprobó una ley local para llenar este vacío, la que se reforzó con la doctrina de los Casos Insulares, pero no fue hasta 1917, después de repetidos planteamientos, que el Congreso de Estados Unidos adoptó en la Ley Jones una Carta de Derechos completa para el país. Treinta

y cinco años después se reconoce el derecho del pueblo puerto-rriqueño a formular su propia Constitución.

## III

*El problema sustantivo.*

Es esencial para la recta solución de este caso resolver si rige o no en Puerto Rico la doctrina de que es válido todo registro que sea incidental a cualquier arresto legalmente efectuado. La suerte que ha sufrido esta doctrina a través de los años en el Tribunal Supremo de Estados Unidos ilustra precisamente la naturaleza pendular, las sucesivas hinchazones y encogimientos, del derecho en este campo. En *Marron* v. *United States*, 275 U.S. 192 (1927), la doctrina recibió una formulación muy amplia. En *Go-Bart Importing Co.* v. *United States*, 282 U.S. 344 (1931) y *United States* v. *Lefkowitz*, 285 U.S. 452 (1932), se limitó severamente a *Marron*, expandiéndose en consecuencia la garantía de la Enmienda Cuarta. En *Harris* v. *United States*, 331 U.S. 145 (1947), se abandonó a *Go-Bart* y a *Lefkowitz*. En *Trupiano* v. *United States*, 334 U.S. 699 (1948), se rechazó a *Harris*. En *United States* v. *Rabinowitz*, 339 U.S. 56 (1950), se revocó a *Trupiano* y se validó el registro sin orden de allanamiento de una oficina de una sola habitación, incluyendo la apertura del escritorio, los archivos y la caja fuerte, por estimarse todo ello incidental a un arresto válido. Es en *Rabinowitz* donde expresó el Juez Frankfurter, en opinión disidente, que el modo en que se enfoque la Enmienda Cuarta afecta necesariamente su análisis. "Al considerar la Enmienda Cuarta, existe una gran diferencia entre, de un lado, reconocer su esencia, a saber, ser una salvaguarda contra la repetición de abusos tan hondamente sentidos por las colonias como para convertirse en una causa potente de la Revolución, y, de otro lado, concebirla tan solo como la imposición del requisito de un trozo de papel." 339 U.S. 56, 69. (Traducción nuestra.)

*Rabinowitz* y *Harris* fueron objeto de intensa crítica. Way, *Increasing Scope of Search Incidental to Arrest,* 1959 Wash. U.L.Q. 261; Note, *Scope Limitations for Searches Incident to Arrest,* 78 Yale L.J. 433 (1969); Note, *The Supreme Court 1966 Term,* 81 Harv. L. Rev. 69, 117–122 (1967). Se movió el péndulo otra vez en la dirección contraria y en *Chimel* v. *California,* 395 U.S. 752 (1969), se revocó expresamente a *Rabinowitz* y a *Harris. Chimel* sostiene en resumen que puede registrarse tanto a una persona arrestada legalmente, en búsqueda de armas o de evidencia del crimen, como el área bajo su control inmediato. Se entiende que el área bajo el control de la persona arrestada es la zona donde ésta puede obtener posesión de un arma o destruir evidencia del crimen.

En *United States* v. *Robinson,* 414 U.S. 218 (1973) y *Gustafson* v. *Florida,* 414 U.S. 260 (1973), se continúa el movimiento oscilatorio. Al menos en lo que toca al registro de la persona en sí, se ha permitido en el caso específico de arrestos por violación a las leyes de tránsito el registro indiscriminado en búsqueda de evidencia de cualquier crimen. En *Chimel* se había impuesto una sola regla para tanto el registro de personas como el de la zona bajo su control inmediato. Existe considerable posibilidad de que *Robinson* y *Gustafson* se extiendan en el futuro, como antes *Chimel,* a ambas situaciones. Véase, por ejemplo, el amplio lenguaje utilizado en *United States* v. *Edwards,* 415 U.S. 800, 802–803 (1974). Algunas cortes federales y estatales ya han dado este paso, a veces mencionando y otras sin mencionar, estas decisiones. *United States* v. *Bertucci,* 532 F.2d 1144 (7th Cir. 1976); *United States* v. *Lewis,* 504 F.2d 92 (6th Cir. 1974); *United States* v. *Nevárez-Alcantar,* 495 F.2d 678, 682 (10th Cir. 1974); *United States* v. *Kaye,* 492 F.2d 744, 746 (6th Cir. 1974); *People* v. *Weintraub,* 320 N.E.2d 636, 638 (N.Y. 1974). *Robinson* y *Gustafson* achican extraordinariamente el ámbito de la Enmienda Cuarta. Ya hemos visto como Cali-

fornia y Hawaii se han negado a adoptar la regla de estos dos casos al interpretar disposiciones paralelas de su Constitución. Hasta cortes federales han intentado aminorar con destreza el impacto de *Robinson* y *Gustafson*. Véase: *Zweibon* v. *Mitchell*, 516 F.2d 594, 628–630, n. 89 (Cir. D.C. 1976).

En *Pueblo* v. *Sosa Díaz*, 90 D.P.R. 622, 627 (1964), resuelto a raíz de *Preston* v. *United States*, 376 U.S. 364 (1964), antecesor de *Chimel*, rechazamos expresamente la regla que un arresto legal convalida *ipso facto* un registro o una incautación sin orden. Afirmamos al efecto que la Sec. 10 del Art. II de nuestra Constitución "protege a la ciudadanía contra un registro que, aunque legal, sea irrazonable" (pág. 626) y añadimos que "el hecho de que el registro sea legal—como se alega en este caso, por ser incidental a un arresto válido—no significa necesariamente que sea razonable." (Pág. 627.) Señalamos finalmente: "También parece conveniente advertir que en ausencia de circunstancias especiales, la mera comisión de una infracción menor de tránsito no autoriza un registro de vehículo. Debe existir, repetimos, una justificación adecuada para ello." (Págs. 631–632.)

En casos subsiguientes hemos tenido ocasión de elaborar las normas sentadas en *Sosa*. En *Pueblo* v. *de Jesús Robles*, 92 D.P.R. 345, 359 (1965), intentamos resumir así la situación:

"(1) La legalidad de un registro sin orden de allanamiento depende de si el registro es razonable y esto a su vez depende de los hechos y circunstancias—la atmósfera total—del caso.

(2) Existe una distinción entre lo que es un registro razonable en el caso de un automóvil y en el caso de una residencia o local fijo, pero tal distinción no ha eliminado el requisito de causa probable.

(3) Una mera infracción menor de tránsito no justifica el registro de un automóvil.

(4) Pero circunstancias especiales pueden proveer la justificación necesaria, en adición a una infracción de tránsito."

En *Pueblo* v. *Costoso Caballero,* 100 D.P.R. 147, 152–153 (1971), resuelto después de *Chimel,* nos expresamos sobre las circunstancias especiales que dictan la razonabilidad de un registro del área bajo el control inmediato de la persona arrestada. Dijimos allí:

"1. Es permisible un registro sin orden de allanamiento efectuado en la persona del arrestado y del área que está a su alcance inmediato. Como hemos dicho antes, esto se justifica para ocupar armas que puedan ser empuñadas y utilizadas por el acusado para agredir a los agentes del orden público o para intentar una fuga, y para ocupar evidencia que de otro modo el arrestado podría destruir.

2. No es permisible un registro sin orden de allanamiento, aunque sea contemporáneo con un arresto válido, de aquellos lugares y muebles de una casa que no estén al alcance inmediato de la persona arrestada. . . . Esa búsqueda que no tiene por propósito evitar los riesgos antes mencionados (agresiones con armas, fuga, destrucción de evidencia) no son registros razonablemente hechos con motivo de un arresto y por lo tanto están proscritos por la Sec. 10 del Art. 2 de la Constitución de Puerto Rico y por la Enmienda IV de la Constitución de Estados Unidos."

■ Nos reafirmamos en la regla de *Sosa, de Jesús Robles* y *Costoso Caballero* de que en Puerto Rico no rige la doctrina convalidando todo registro que sea incidental a cualquier arresto legalmente efectuado. Estamos conscientes de que los casos en que se invoca la garantía contra los registros y allanamientos irrazonables plantean problemas centrales de la administración de la justicia en una sociedad democrática. En este género de casos, como en tantos otros, hay colisión de intereses y nuestra tarea es luchar por hallar los modos de propiciar la armonía entre ellos. De un lado tenemos el interés histórico en proteger al ciudadano de los desmanes que provocaron en primer término el establecimiento de la garantía. Del otro, se halla el interés en proteger a la sociedad de los estragos del crimen. Consideramos que el método más deseable de lograr el equilibrio necesario no consiste en

la formulación de reglas mecánicas, excesivamente abarcadoras, como la que hemos venido discutiendo. Debemos distinguir entre categorías de situaciones, adentrarnos en la atmósfera total de cada caso para hallar el significado preciso, dentro de unas circunstancias específicas, de un concepto tan elusivo y volátil como es el de la razonabilidad. Nuestra tarea es conciliar los intereses en pugna y no permitir que uno pulverice al otro. El sistema democrático de vida se funda en la libertad con orden, no en el orden sin libertad o en la libertad que lleve al caos.

No es resolvible este caso, por tanto, con la mera invocación de la legalidad del arresto. Tenemos que enfrentarnos al problema directo de la razonabilidad de la incautación.

La incautación ocurre tras un arresto por dos violaciones a la Ley de Vehículos y Tránsito: conducir un vehículo en dirección contraria a la autorizada y hacerlo sin poseer licencia de conductor. Aun calificando de menores estas infracciones para los fines que nos ocupan, debe decidirse si se dieron aquí, sin embargo, circunstancias especiales adicionales que provean la justificación necesaria para la incautación y el registro. Se habrá advertido que el agente en este caso vio picadura de supuesta marihuana encima de un paquete en el asiento delantero. El agente no registró el vehículo o se incautó de nada al principio. Fue al encenderse la luz interior del automóvil que inadvertidamente percibió los paquetes y observó lo que le pareció picadura o semillas de marihuana. Fue en tales circunstancias que olfateó un paquete y, por el entrenamiento general que se recibe en la Academia de la Policía, confirmó que en efecto podía contener marihuana. De inmediato puso bajo arresto al apelante y éste se dio a la fuga.

Estimamos que en las circunstancias concretas descritas, fue razonable la actuación del agente y que no se violaron los derechos del apelante bajo las disposiciones de la Sec. 10 del Art. II de la Constitución del Estado Libre Aso-

ciado. Es indispensable, no obstante, exponer la base teórica de tal conclusión para aclarar la justa dimensión de la pauta sentada y evitar su aplicación indebida.

■ Este caso envuelve, como se habrá podido ver, el uso de la doctrina sobre la prueba a plena vista, la cual se ha rodeado de diversas salvaguardas para evitar los males que puede desatar. En *Pueblo* v. *González del Valle*, 102 D.P.R. 374 (1974), ya señalamos los peligros de que declaraciones sobre el acto-ilegal-a-plena-vista, en transacciones que normalmente se amparan en la clandestinidad, pueden degenerar en testimonio estereotipado. Expusimos allí, entre otras, que "tanto los casos de la-evidencia-abandonada-o-lanzada-al-suelo como los casos del acto-ilegal-a-plena-vista deben, en ausencia de otras consideraciones, inducir sospecha de la posible existencia de testimonio estereotipado." (Pág. 378.) Debe recordarse, además, que la doctrina en sí, a pesar de que sus contornos no están todavía completamente definidos, impone otros requisitos para justificar su utilización. Tales requisitos pueden resumirse así:

1) El artículo debe haberse descubierto por estar a plena vista y no en el curso o por razón de un registro. Véase: *United States* v. *Lee*, 274 U.S. 559 (1927).

2) El agente que observe la prueba debe haber tenido derecho previo a estar en la posición desde la cual podía verse tal prueba. Véanse: *Harris* v. *United States*, 390 U.S. 234 (1968); *Ker* v. *California*, 374 U.S. 23 (1963).

3) Debe descubrirse el objeto inadvertidamente. Véanse: *Coolidge* v. *New Hampshire*, 403 U.S. 443 (1971); *Trupiano* v. *United States*, 334 U.S. 699 (1948).

4) La naturaleza delictiva del objeto debe surgir de la simple observación. Véanse: *Stanley* v. *Georgia* 394 U.S. 527 (1969).

Respecto a esta doctrina, enfocada desde el punto de vista de la Enmienda Cuarta, véase: Lewis and Mannle, *Warrantless*

*Searches and the "Plain View" Doctrine: Current Perspective,* 12 Crim. L. Bull. 5 (1976).

■ En el caso de autos se produjeron las circunstancias que justifican la aplicación de la doctrina, cumpliéndose los requisitos mencionados y venciéndose la sospecha que necesariamente surge en torno a testimonios del género aquí envuelto. (³)

*Se confirmará en consecuencia la sentencia apelada.*

Los Jueces Asociados Señores Rigau, Torres Rigual y Martín concurren en el resultado.

(³) La decisión de este caso sobre la base expresada en él no excluye en modo alguno la aplicación de otras teorías firmemente establecidas para medir la razonabilidad del registro de un automóvil, a distinción del registro de un hogar. *Carroll* v. *United States,* 267 U.S. 132 (1925); *Cooper* v. *California,* 368 U.S. 58 (1967) y *Chambers* v. *Maroney,* 399 U.S. 42 (1970). Compárese: *Pueblo* v. *Vargas Delgado,* 105 D.P.R. 335 (1976).